IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF AUDREY B.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF AUDREY B., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE AND CROSS-APPELLEE,

V.

TIFFANY L., APPELLANT, AND CLIFFORD L., APPELLEE AND CROSS-APPELLANT.

Filed July 3, 2023.    No. A-22-893.

Appeal from the County Court for Cheyenne County: RANDIN R. ROLAND, Judge. Affirmed in part, and in part reversed and remanded for further proceedings.

Robert S. Harvoy, for appellant.

Amber Horn, Chief Deputy Cheyenne County Attorney, for appellee State of Nebraska.

Stacy C. Bach, of Nossaman Petitt Law Firm, P.C., L.L.O., for appellee Clifford L.

Audrey M. Long, guardian ad litem.

PIRTLE, Chief Judge, and MOORE and ARTERBURN, Judges.

MOORE, Judge.

## I. INTRODUCTION

Tiffany L. appeals, and Clifford L. cross-appeals, from an order of the Cheyenne County Court sitting as a juvenile court, terminating their parental rights to their child, Audrey B. Upon our de novo review of the record, we affirm the juvenile court's order with respect to Tiffany's termination, and reverse and remand for further proceedings with respect to Clifford's termination.

- 1 -

## II. STATEMENT OF FACTS

### 1. PROCEDURAL BACKGROUND

Tiffany and Clifford are the biological parents of Audrey, born in October 2015. They were married a few weeks after Audrey's birth and have since separated, though the date of their separation is unclear from the record.

As discussed further below, when this juvenile case began, Audrey was removed from Tiffany's care along with her half-brother, Leon C. Leon was placed with his biological father in June 2021, and he is no longer a part of this case. As such we only discuss Leon as necessary to the resolution of the current appeal by Tiffany.

### (a) Tiffany

In April 2020, while Tiffany was living in Sterling, Colorado, with the children, a Sterling police officer contacted a family friend of Tiffany's and asked her to come pick up Audrey and Leon. The family friend subsequently called the Nebraska Department of Health and Human Services (Department) hotline to report her concerns about Tiffany.

On May 5, 2020, the State filed petitions in the juvenile court alleging the children fell within the meaning of § 43-247(3)(a) in that they lacked proper parental care due to the faults or habits of Tiffany or that Tiffany neglected or refused to provide them with proper or necessary subsistence, education, or other care necessary for their health, morals, or well-being. The allegations of the original petitions are lengthy, reflecting concerns regarding Tiffany's possible drug use, erratic behavior, and mental health issues; her lack of stable housing; her history of leaving the children with different caregivers for extended periods without a proper delegation of parental rights; and her previous history with the Department. The State also filed motions for ex parte temporary custody of the children, which were granted by the court on May 5. Audrey has remained out of the home since she was removed.

On June 15, 2020, the juvenile court entered an order adjudicating the children, requiring Tiffany to undergo a psychological evaluation, and instructing the Department to begin an Interstate Compact on the Placement of Children (ICPC) to Louisiana to explore placement with each of the children's respective fathers. On June 30, Tiffany filed a notice of appeal to this court. On November 6, we affirmed the juvenile court's adjudication order. Additional details regarding Audrey's removal and the evidence adduced at the adjudication hearing are set forth in our opinion affirming the adjudication of the children. See *In re Interest of Leon C. & Audrey B.*, No. A-20-475, 2020 WL 6591203 (Neb. Ct. App. Nov. 6, 2020) (selected for posting to the court website).

The juvenile court entered a dispositional plan as to Tiffany on January 21, 2021, adopting the case plan presented by the Department. Tiffany's case plan goals included utilizing a safety network when she is struggling with her mental health to ensure that her children are safe at all times and parenting her children in ways that are developmentally appropriate; providing safe and stable housing for her children; and remaining substance free. The court again ordered that Tiffany undergo a psychological evaluation.

On March 4, 2021, Audrey's and Leon's Guardian ad Litem (GAL) filed a motion to suspend the supervised visitation between Tiffany and the children. The motion alleged that Tiffany had failed to complete the court-ordered psychological evaluation, was becoming verbally

and physically violent during visitation, and had become so emotional that the children were having to console Tiffany during the visits. The motion also noted that Audrey's current counselor recommended that the visits be suspended until Tiffany complied with the evaluation and its recommendations.

A hearing on the GAL's motion for suspended visitation was held on March 31, 2021. The juvenile court ordered that visitations between Tiffany and Audrey be suspended until further order. The court also ordered Audrey's counselor to prepare a written expectations plan for Tiffany and Audrey to resume visitations, and ordered Tiffany to comply with the written expectations. The court scheduled biweekly family team meetings and monthly visitation status hearings to monitor how visitations were progressing. It appears from the record that the parties were able to reach an agreement and plan for visitations between Tiffany and Audrey, though no specific order was made by the juvenile court.

On December 3, 2021, Tiffany filed a motion for change of placement, which requested that Audrey be placed back in her physical custody and care. Tiffany's motion was denied during a review hearing on January 4, 2022.

### (b) Clifford

The March 24, 2021, Department case plan indicates that genetic testing confirmed Clifford as Audrey's biological father. The case plan notes that Clifford was living in Louisiana, and had indicated an interest in developing a case plan and completing an ICPC for possible placement of Audrey. The case plan also notes that Clifford's home was recently hit by a natural disaster and that he was staying with his mother, Vanessa, as he completes repairs to his home. The April 24 Department case plan states that the Department was setting up virtual visits for Clifford and Audrey and that Clifford had expressed a willingness to travel to Nebraska for in person visits, however, the plan did not outline any specific goals for Clifford.

The juvenile court entered a dispositional plan as to Clifford on August 5, 2021, adopting the case plan presented by the Department. Clifford's singular case plan goal was that he meet Audrey's needs and demonstrate appropriate parenting skills by participating in visitation.

On December 28, 2021, Clifford filed a motion requesting that the Department be ordered to complete an expedited ICPC to Louisiana so that Audrey may be placed with Clifford. The following day Clifford filed another motion for an expedited ICPC for his mother, Vanessa, also in Louisiana. Clifford's motion regarding Vanessa's ICPC was granted during a review hearing on January 4, 2022. The court noted in its order that the Department had already begun Clifford's own ICPC.

### (c) Review Hearings and Motion for Termination

Several review hearings and visitation status hearings were held during the case, occurring on March 25, 2021, April 28, May 27, July 8, August 5, September 2, September 20, November 4, December 3, January 4, 2022, March 17, and June 6. The goals of Tiffany's and Clifford's court adopted plans have been consistent throughout the case. Additionally, three exception hearings were held on September 20, 2021, November 4, and December 3 to determine whether the State may be excused from the mandatory requirement of Neb. Rev. Stat. § 43-292.02(1) (Cum. Supp. 2020) that it file a petition to terminate parental rights under certain circumstances. An exception

was found at all three hearings based on the consent of the parties. On March 17, 2022, the GAL filed a motion for termination of Tiffany's and Clifford's parental rights to Audrey, alleging statutory grounds to terminate Tiffany's rights existed pursuant to Neb. Rev. Stat. § 43-292(2), (3), (4), (5), (6), and (7) (Reissue 2016), and Clifford's rights under § 43-292(2), (3), (6), and (7). The GAL also alleged that termination was in Audrey's best interests. The same day, the GAL also filed a motion requesting the appointment of a GAL for Tiffany. The motion alleged that such appointment was necessary because Tiffany's mental capacity had been called into question by the inclusion of allegations under § 43-292(5) in the motion to terminate. On April 7, 2022, the juvenile court entered an order appointing a GAL for Tiffany.

### (d) Change of Placement

On May 6, 2022, Clifford filed a motion for change of placement, requesting that Audrey be placed with Vanessa. A hearing was held on Clifford's motion on July 12. The juvenile court received 25 exhibits into evidence, including a consent to the change of placement by the State and Audrey's GAL, a completed ICPC for Vanessa, and pictures of Vanessa's home. The court granted the placement change and ordered therapeutic releases to be signed to facilitate initiating services for Audrey in Louisiana. A few days later, the Department moved Audrey to Louisiana.

### 2. TRIAL

Trial was held over the course of 4 days in July, August, and September 2022. At trial, 18 witnesses testified and over 30 exhibits were received by the juvenile court.

### (a) Evidence as to Tiffany

#### *(i) Removal*

Jennifer Burgess, an initial assessment caseworker, performed investigations into the family in 2018, 2019, and April 2020, which ultimately led to the current juvenile case. The intakes in 2018 and 2019 involved reported concerns about Tiffany's mental health and substance use, and Tiffany's concerns that Leon had been sexually abused. Leon had been forensically interviewed on 17 occasions as a result of Tiffany's disclosures, but all of the allegations were determined to be unfounded.

Audrey and Leon were removed as a result of the April 2020 intake, which found that the family did not have consistent access to housing, food, and clothing. Tiffany was very vague in her interview with Burgess and would not disclose her address or other specific details. She also stated that she was working with law enforcement on a drug bust and was in witness protection. Burgess noted that the Department was concerned about Tiffany's mental health and possible substance use.

Burgess also recounted an incident in April 2020 where Tiffany left Leon and Audrey in her car and went into a store. The car was then put into gear and went through the store window. Tiffany reported that an unknown man opened the car door and put the car into gear, but Colorado social services relayed to the Department that the children were the ones who placed the car into gear.

During Tiffany's various intakes, she also made allegations of domestic abuse against both Leon's and Audrey's fathers, but there was no documentation to support these claims and Burgess' investigations did not substantiate any domestic abuse allegations.

Tiffany testified to her own challenging childhood, which included sexual abuse by her stepfather at a young age, and being removed from her mother's care and placed into multiple foster homes, group homes, a residential treatment center, and juvenile detention. Tiffany also described the trauma of having her own children removed or "kidnapped." Tiffany continued to deny that her own children had driven through the store window, as they were not able to reach the car's pedals.

Tiffany testified that because she has been through trauma herself, she understands more than the case professionals what Audrey needs and what professionals have failed to do for her. When asked who created the trauma for Audrey, Tiffany responded that Clifford had, due to domestic violence occurring between Tiffany and Clifford. Tiffany took responsibility only for staying in a relationship with Clifford and for her previous drug use. When asked about her role in the children's removal she stated, "I am the victim, as well as my children in all of this. And I don't think I should have to apologize."

*(ii) Mental Health and Substance Use*

The Department remained concerned for Tiffany's mental health throughout the case. Kortni Zeiler supervised Tiffany's caseworker from January to June 2021. Zeiler testified that Tiffany's first psychological evaluation did not include any recommendations or a treatment plan. The evaluator later contacted Zeiler with concerns that Tiffany had been dishonest during her evaluation and recommended that Tiffany be evaluated a second time. This first psychological evaluation was not offered into evidence and it is unclear from the record when it occurred.

Zeiler testified that Tiffany was evaluated for a second time through Cirrus House in Scottsbluff and treatment was recommended. A Department case plan dated April 21, 2021, noted this evaluation and the recommendation of inpatient treatment. The only psychological evaluation of Tiffany entered into evidence is an evaluation from Nebraska Mental Health Centers in Lincoln from March 2021. It is unclear whether this evaluation is the same one referenced by the Department as the second, Cirrus House evaluation. The March 2021 evaluation diagnosed Tiffany with severe post-traumatic stress disorder (PTSD), persecutory type delusional disorder, and major depressive disorder with anxious distress. It recommended that Tiffany participate in twice-weekly intensive individual therapy in close coordination with medication management and intensive treatment in the form of resident care, should Tiffany fail to comply with outpatient treatment.

Tiffany disagreed that medication was an effective way to manage her mental health. She described being used as a "guinea pig for big pharma" as a child in foster care, and noted that medication is a "Band-Aid" solution and stated that "I would rather not use a Band-Aid to get through whatever I'm going through."

In April 2021 Tiffany enrolled in St. Monica's residential substance abuse treatment program in Lincoln. Tiffany received a parenting assessment on September 15, while in treatment. The parenting assessment noted both that Tiffany was at medium risk of having inappropriate expectations of children and can be demanding or controlling, and that Tiffany has a high level of

empathy for her child. The parenting assessment again recommended individual therapy for Tiffany, and that Tiffany and Audrey participate in Child Parent Psychotherapy (CPP).

Tiffany completed the 8-week intensive inpatient substance abuse treatment program and started Project Mother and Child, the secondary treatment program at St. Monica's which includes assessing the patient's children and their needs and including them into the treatment plan. The Department transported Audrey to and from St. Monica's in Lincoln, nearly 6 hours from her foster home in Minatare, every weekend during August and September 2021 for visits with Tiffany while Tiffany was participating in Project Mother and Child. However, on September 18, Tiffany was unsuccessfully discharged from St. Monica's. A discharge report reflects that Tiffany became "escalated" and made specific threats of violence to another woman in the program. Audrey was never placed with Tiffany while she was residing at St. Monica's.

Dr. Mark Hald, a licensed psychologist, was asked by the Department to do an evaluation of Audrey in July 2021. Hald testified that he diagnosed Audrey with other specified trauma and stressor related disorder; meaning that Audrey had been exposed to various traumatic events in her childhood which affect her levels of anxiety. Audrey was also diagnosed with other specified depressive disorder. Hald noted developmental concerns related to Audrey's sensory reprocessing disorder and other nervous dysfunction, including stress-related sleeping problems. Based on Audrey's diagnoses, Hald recommended that Audrey's parents participate in the Circle of Security parenting class, use physical activity to boost Audrey's mood and decrease anxiety, and have medication checks to determine if medication would manage Audrey's symptoms.

Hald began seeing Audrey individually in July 2021. When Tiffany was discharged from St. Monica's in September, Hald also began facilitating weekly sessions of CPP between Audrey and Tiffany. Hald explained that CPP involves assisting the parent in helping the child make sense of the family's history so the child can see the parent as a safe and secure attachment figure in their life. Audrey's and Tiffany's CPP sessions included playing games, reading stories, and drawing. At times when Audrey would struggle, Hald worked with Tiffany to empathize with Audrey's feelings and coached Tiffany through helping Audrey manage her emotions, with the goal that Tiffany be attentive to Audrey's past trauma and its manifestations. Hald also helped Tiffany complete the Circle of Security coursework she had started at St. Monica's.

Hald noted that over the months he facilitated CPP, he saw Tiffany improve in her ability to calm Audrey when she was upset. Tiffany appeared to be fairly regulated and attentive to Audrey. Hald was generally aware that Tiffany had referenced having a disability, although she seldom mentioned it to him. When asked if Hald had discussed providing accommodations for Tiffany with the Department, Hald responded that he believed Tiffany was accommodated "all the way along," in terms of offering her various services to address her mental health needs.

Hald facilitated the weekly CPP sessions for Audrey and Tiffany from September 2021 until May 2022. Hald found that Audrey "never really wanted to talk about things," whether in individual or CPP sessions. Hald believed that Audrey's lack of permanency contributed to her unwillingness to share and was in need of a placement where she feels safe to express her likes and dislikes and learns to regulate her own emotions. Hald described Audrey's therapeutic progress during their time together as "static."

On May 6, 2022, Hald participated in a family team meeting, during which Tiffany wanted Hald to tell the team of case professionals that she should have unsupervised parenting time. Hald

explained during the meeting that he was not the only professional who needed to weigh in on the decision to allow unsupervised visits, and he asked Tiffany, "How is it that after two years you have not conveyed confidence in the team of people helping you to have unsupervised time?" Hald's comment upset Tiffany and she called Hald on May 11 to inform him that she "was done with [CPP], and . . . that I wasn't going to see Audrey and she was upset because I didn't step up and be the man she needed me to be at this team meeting, and that she was done with me." Hald tried to respond to Tiffany's comments but she continued to cut Hald off and eventually hung up the phone.

The following day, Tiffany emailed Hald to say that her attorney told her she must participate in CPP, and that she would comply with her attorney's directive. At trial, Hald noted that Tiffany had lost confidence in him as a practitioner and she was not demonstrating any accountability or insight that she may be a part of the problem. After consultation with other professionals and his own self-reflection, Hald did not restart CPP but saw Audrey for a few more individual sessions before her move to Louisiana. Hald testified that Tiffany did not want Hald to continue seeing Audrey and would have preferred Audrey to begin seeing a new individual therapist. Hald believed this would have caused harm to Audrey, due to their established relationship.

Tiffany testified about her termination of services with Dr. Hald and described it as a "miscommunication." Tiffany felt that she was ready for unsupervised parenting time, or even an overnight visit with Audrey, but that Hald was not listening to her, did not have Audrey's best interests in mind, and was unfairly siding with the Department. Because Tiffany felt "let down" by Hald, she told him that she was no longer going to allow Audrey to see him for either CPP or individualized therapy until the matter was resolved, which Hald interpreted as Tiffany firing him.

Sonya Oliverius supervised Tiffany's caseworker for the entire case except for the 6 months of Zeiler's supervision from January to June 2021. Oliverius testified that the Department had contacted two different CPP providers in an effort to resume CPP between Tiffany and Audrey, but that neither had any openings in the near future.

Tiffany has participated in weekly individual therapy sessions with Megan Lawhon, a doctoral intern under Hald's supervision, since September 2021. Lawhon testified that Tiffany's treatment plan included working on her ability to recognize aggressive interpersonal behavior and being able to express concern without excessive confrontation. Lawhon continues to work with Tiffany on interpersonal skills, trauma processing, and emotional regulation. An update letter from Lawhon dated March 10, 2022, notes that Tiffany has expressed willingness to continue mental health treatment and that "many of her traits are fairly chronic in nature and she will likely need extended support."

Jessica Goodall was one of Tiffany's family support and visitation workers from August 2021 to January 2022. Goodall described Tiffany's and Audrey's interactions during parenting time as generally positive, noting a clear bond between the two. However, at times Goodall also observed Audrey screaming at Tiffany when she became upset. Tiffany was receptive to Goodall's coaching and learned skills to help Audrey deescalate. However, Tiffany also exhibited extreme moods during parenting time, either being very subdued and falling asleep, or being extremely energized and bubbly.

At one point during her time on the case, Goodall received a phone call from Tiffany who was hysterical and saying that she was going to kill herself. Goodall relayed the phone call to her supervisor because she was concerned for Tiffany's safety. Shortly thereafter, Tiffany mentioned to Goodall that the FBI was watching her. Goodall recalled a time when she and Tiffany were in a car and Tiffany saw a black SUV and asked Goodall to turn away from it, as if they were being followed. Tiffany also told Goodall that the Army and the Marines were both watching out for her, that the CIA and NSA were tapping her phones, and that she was in the witness protection program, as well as being a ring leader in the Mexican cartel. Occasionally Tiffany made comments regarding federal law enforcement agencies in front of Audrey during parenting time. When Goodall would tell Tiffany that she could not make those comments in front of Audrey, Tiffany would start crying and Goodall would have to end the visit. Goodall noted that Audrey seemed unaffected by the comments, but when Tiffany would cry Audrey would console her.

When asked about becoming emotional during visitations, Tiffany responded, "Who doesn't have a bad day? Who doesn't get sad or angry? Are we not allowed to have emotions? Because that's what I feel like the Department says I'm not allowed to do. I'm not allowed to have emotions. I'm not allowed to be human."

Goodall testified that she had administered approximately 12 drugs tests to Tiffany and recalled at least one positive result in December 2021. When Goodall raised the positive test with Tiffany, Tiffany told Goodall that she was taking Sudafed for a cold and later denied that the test was truly positive. Lab testing later confirmed that the drug test was positive for methamphetamine.

A copy of Tiffany's drug testing results from November and December 2021 were entered into evidence. Of the 15 tests reflected, Tiffany tested positive for methamphetamine twice, had a presumptive positive for methamphetamine once (the sample was too limited for an exact result), and refused to test twice. Oliverius noted that Tiffany had struggled emotionally during December 2021, which was when the permanency goal of adoption was added to Audrey's case plan, and Clifford traveled to Nebraska to have in person parenting time with Audrey. Other family support workers testified to administering drug tests to Tiffany throughout the case, with none of the tests being positive.

Tiffany testified that since her treatment at St. Monica's, she has not used any substances. When confronted with the positive drug test from December 2021, Tiffany again stated that she was taking cold medicine and energy drinks, which had the same effects of methamphetamine.

In January 2022, Goodall stopped providing services to Tiffany because Tiffany grew hostile towards Goodall and their relationship had broken down. Goodall did not believe that it would be safe for Tiffany to be alone with Audrey. After working with Tiffany for 6 months, Goodall opined that Tiffany would need live-in assistance to ensure that Audrey was safe and that both Audrey and Tiffany were having their needs met.

In addition to Goodall, multiple case professionals have witnessed Tiffany's delusional thinking. Throughout the case, Tiffany told Audrey's CASA volunteer, Zeiler, Oliverius, and Penny Metheny, the Department caseworker assigned to the case since June 2021, that she works for various federal law enforcement agencies including the CIA, DEA, and FBI. Both Oliverius and Metheny asked Tiffany to provide agency contacts so that they might verify her claims, but Tiffany never provided any information.

Oliverius was concerned about Tiffany's delusional thinking because Tiffany also made allegations that her children had been sexually abused despite there being no credible evidence. At one point during the case, Tiffany wanted to take Audrey in for a hymen check. Oliverius would not allow Audrey to undergo the exam, as Tiffany had alleged the abuse had occurred years ago. Tiffany threatened Oliverius with the FBI and stated that she would take Oliverius to court to ensure that Audrey was taken to the exam appointment.

Metheny also described an incident from the spring of 2022, where she received a report from the Sterling Police Department stating that Tiffany had gone to the police station because she believed that she had been drugged by people she was with and that she had items stolen out of her car. The Sterling police did not perform a drug test, but one was performed in Nebraska several days later which was negative. The Sterling Police Department case report from May 24, 2022, states that Tiffany told the responding officer that she was attempting to use her report of theft and being drugged "as a way to back up her story if she tested positive for Methamphetamine on her next UA test."

Adam Ferichs, the Cheyenne County Sheriff, testified that beginning in 2018, Tiffany would come into his office to report that she was working for the FBI, that she was an informant, and that the Mexican mafia was after her. Over the years, Ferichs had seen Tiffany's mental health fluctuate between periods of delusion and lucidity. However, as recently as a month before trial, Tiffany went to Ferich's office to tell him that she was again working with the FBI. Tiffany never provided Ferichs with any specific names of anyone in a federal agency who Ferichs could contact to verify Tiffany's claims. Between the days of the termination trial, Ferichs made a phone call to an agent at the FBI's North Platte Field Office who contacted the Omaha Central Office and advised that Tiffany is not currently, nor had ever been, an informant for the FBI.

Tiffany testified that she had said she was in witness protection because "putting a child in foster care, is a form of witness protection for a child." Regarding her alleged work at various federal law enforcement agencies, Tiffany stated that her "name may be on some documents somewhere," but conceded that she had not received any compensation nor filled out any employee paperwork.

### (iii) Tiffany's Disability

Tiffany testified that her PTSD diagnoses qualified her for Social Security Disability Insurance (SSDI) in 2019. Tiffany described being triggered or stressed by certain smells, sights, words, or tones, which cause her to have flashbacks and episodes of PTSD. On cross-examination, an attorney's tone caused Tiffany to have such a flashback and she had to take a break from testifying. Tiffany conceded that she did not know whether Audrey's behaviors could affect her own mental health.

Tiffany stated that she mentioned a need for certain accommodations throughout the case. When asked specifically what accommodations Tiffany needed, she noted that she requires hands-on learning and needed to be shown proper parenting skills. She did not believe that her family support workers modeled appropriate parenting because most of the time during visits they only took notes. Tiffany said she has never fully understood what the Department was requiring of her throughout the case because they were not explaining or demonstrating her goals, rather just handing her a case plan and instructing her to meet her goals. Tiffany communicated her needs

and wants to the Department and "[the Department] said, well, work on your mental health, and da, da, da, da. No, I'm saying you all have failed me. You all failed my children."

Metheny became aware that Tiffany was on SSDI while Tiffany was in treatment at St. Monica's in August 2021. However, Tiffany relayed only that she was on SSDI for her "mental health," and did not provide Metheny with a specific diagnosis or request accommodations. Metheny stated that it was the Department's protocol to make appropriate accommodations once requested, but that the parent must ask the Department for accommodations. Metheny likewise never received any correspondence from Lawhon, Tiffany's therapist, indicating Tiffany needed accommodations. Metheny also noted that the Department case plans were formulated under a trauma-informed response, designed to address and mitigate Tiffany's mental health concerns. Metheny reviewed Tiffany's case plan goals with her over the phone, in person, and during family team meetings.

Zeiler and Oliverius testified consistently, stating that Tiffany identified that she had a disability related to her mental health, but never requested additional services or that accommodations be made.

A family support worker who also supervised Tiffany's visits was told by Tiffany that she was legally disabled because she had PTSD. The worker did not believe that the services referral included information regarding whether Tiffany had a disability.

*(iv) Parenting Time*

Zeiler testified that in early 2021, the children's therapist recommended that visits between Tiffany and Audrey and Leon be suspended. Before visits were halted, Audrey and Leon would consistently have to calm Tiffany down when she became emotional. When family support would try to guide or redirect Tiffany, she would become agitated. Zeiler was also aware of an incident when Leon was so upset following a visit with Tiffany that he destroyed the therapist's office. No in person visits occurred while Tiffany was in intensive inpatient treatment at St. Monica's, but resumed with Audrey in August 2021 when she began Project Mother and Child.

In the fall of 2021, because CPP between Tiffany and Audrey was progressing well, Hald recommended that the visitation worker step outside to allow some time for unsupervised parenting time with the worker close by. Metheny testified that Tiffany was permitted to have 5-minute "step outs" for 3 to 4 weeks, and then the Department went up to 10-minute "step outs." However, step outs were halted in December 2021 because Audrey had extended parenting time with Clifford and Tiffany threatened suicide. When Metheny discussed why step outs would be suspended with Tiffany, Tiffany accused Metheny of taking her words out of context. Step outs were reinstated a few months after the incident in December 2021, but since the start of the case Tiffany has never had more than 10 minutes of unsupervised parenting time.

Oliverius agreed that Tiffany demonstrated appropriate parenting skills by being prepared with activities and meals for visits with Audrey. However, other witnesses testified that Tiffany struggled with having appropriate conversations. Janet Vath supervised Tiffany's parenting time with Audrey and Leon for 6 months in 2020, though she was unable to recall specific dates. Vath described Tiffany telling her children on visits that the workers and professionals on her case were stupid, and Tiffany threatening the visitation workers with the CIA and FBI. Visitation workers who reported to Vath also relayed to her that Tiffany kept telling her children that they would soon

be home with Tiffany, and that Tiffany refused to take any redirection from the workers when they instructed her to stop discussing the case with her children.

Metheny reported that during a virtual visit with Leon in the summer of 2021, Tiffany told Leon that his biological father was not his father. Leon became distraught and the visitation worker was unable to redirect because "the words were already out there." Leon's father took him to a therapist in Louisiana who recommended no further contact with Tiffany as it was too disruptive for Leon. Metheny was also informed by a visitation worker in December 2021, shortly before Clifford traveled to Nebraska to visit Audrey, that Tiffany had stated during parenting time that she was worried about Clifford abusing Audrey because it had happened before.

Metheny also testified that Audrey would frequently return from visits with Tiffany "discombobulated." Audrey would either be clingy with her foster parent or would not listen and could not be redirected.

Jessica Paben supervised Tiffany's parenting time beginning in May 2022. Paben supervised the last in person visit between Tiffany and Audrey before Audrey was placed with Vanessa in Louisiana. During this visit, Tiffany attempted to get Audrey into her car. When Paben instructed Tiffany to stop, Tiffany yelled at Paben and told her, in front of Audrey, that if Tiffany had wanted to kidnap Audrey, she would have already done so. Tiffany went on to tell Paben that redirection like that made her want to get a gun and start shooting people. Paben was unable to recall if Audrey was outside for Tiffany's shooting comment.

Paben has also been supervising Tiffany's virtual visits with Audrey since her placement change. Paben noted that Tiffany and Audrey have a good relationship, but that every virtual visit is different. Tiffany does well at engaging Audrey and can usually keep Audrey on the virtual visit for 30 to 45 minutes. However, Paben has noticed that Tiffany's surroundings impact her own engagement in the visit. If Tiffany is at home or in a more secluded area, she seems more interested and interactive with Audrey, but Tiffany is disassociated on visits she conducts in her car or with other people around.

### (v) Hostility Toward Others

Oliverius testified that she had to be more involved in this case than in typical cases as a supervisor due to the complaints and allegations Tiffany made regarding the Department. Tiffany threatened Oliverius' job and to turn her in to the FBI, and made similar threats to Oliverius' caseworkers. Tiffany was also frequently combative during family team meetings, where she was argumentative and struggled to receive feedback. Tiffany requested some meetings to end early and hung up her phone in others. Metheny likewise testified that Tiffany could get defensive and accusatory during family team meetings when someone had feedback Tiffany did not want to hear. Several team meetings ended abruptly.

Oliverius also received complaints from the service providers in regards to allegations Tiffany has made against their workers. The providers have been concerned about potential liability and as of trial, four different services companies have been assigned to Tiffany's case.

Vath testified that she stopped providing services to Tiffany because Tiffany tried to attack her in September 2020. When Tiffany did not confirm a specific visit, despite Vath calling her twice, it was canceled. Tiffany then drove to Vath's office and confronted Vath while Vath was in her car, opening the car door and pushing a tape recorder in Vath's face. Because Tiffany would

not leave Vath alone, Vath called the police. While the police were at the scene, Tiffany walked away from Vath, but pointed her fingers to look like a gun and said, "bang, bang, you're dead." Tiffany was arrested and a no contact order was later put in place between Vath and Tiffany. Tiffany was charged with terroristic threats, resisting arrest, obstructing a peace officer, and disturbing the peace.

Lindsey Durman, a facilitation specialist who supervises family support and visitation workers, worked on Tiffany's case from June 2021 to May 2022. During that time half of the visitation workers assigned to Tiffany's case refused to supervise her parenting time. Durman noted that the number of workers assigned to Tiffany's services was atypical. One worker wrote Durman an email saying that she was both physically and emotionally exhausted from facilitating Tiffany's parenting time. Multiple workers also reported to Durman comments made by Tiffany which caused them concern; including comments regarding the Mexican cartel and the witness protection program, and continuous threats to take workers to the FBI or report them to the news media. These comments made by Tiffany occurred during her parenting time while Audrey was present.

Durman also attended Tiffany's family team meetings twice a month while she was supervising her services. Durman attempted to address Tiffany's comments during the meetings, but Tiffany's response was argumentative and defensive.

Metheny testified that Tiffany made numerous accusations against the visitation workers which were unsubstantiated, including that a worker was buying gifts for Audrey or was spending a lot of time on her phone during visits. However one complaint made by Tiffany, that a worker had advocated for her to use corporal punishment on Audrey, was substantiated. Ferichs notified the Department and believed that the specific worker was no longer employed with the services company.

Paben testified that during Tiffany's last in person visit with Audrey, Tiffany stated she was going to harass "the. . . fuck out of Mrs. Long," Audrey's GAL. Tiffany also told Paben that she was going to call the Department regarding the GAL's own children "to see how she liked it and to see how good of a mom she is."

Tiffany also had repeated conflict throughout the case with Vanessa, Audrey's paternal grandmother and new placement. Vanessa described her relationship with Tiffany as "troubled," and noted that the two have had differing opinions since they first met. Since Audrey had been placed with Vanessa, Tiffany has made multiple reports alleging neglect by Vanessa. Metheny stated that the Department was not supportive of placing Audrey in a guardianship as opposed to a complete termination of Tiffany's rights, partly because there was a risk of ongoing harassment of Vanessa by Tiffany. During a visit to Tiffany's home in June 2022, Tiffany told Audrey's CASA volunteer that "if she could get away with murder, she would murder Vanessa."

Regarding her hostility toward various case professionals, Tiffany testified that her PTSD makes her question the intentions and motives of certain people, including the Department. She regarded this tendency as a "plus," and alleged that she had noticed her children being medically neglected during the case.

### (vi) Overall Case Progress

Tiffany's mother and friends testified to the love Tiffany has for Audrey. Additionally, throughout the trial, all visitation workers and Audrey's CASA volunteer recognized the love Tiffany has for Audrey and their shared affection.

Metheny noted some improvement in Tiffany's ability to parent throughout the case. Tiffany initially worked well with Hald, integrating his recommendations for use of behavioral and emotional charts to gauge Audrey's emotions from the day and a reward system to support Audrey's listening skills. Tiffany also took care to plan meals for visits with Audrey, as well as budgeting for and planning outings during her parenting time. Metheny described Audrey having fun going shopping or to a coffee shop with Tiffany. Tiffany also met several of her case plan goals, including obtaining a safety network, learning how to ask for help, obtaining safe and stable housing, and completing the Circle of Security parenting class.

However, Metheny also observed a pattern of Tiffany doing well for about 60 days and then beginning to struggle again. While Metheny noted that Tiffany had relapsed during the case, she stated that the Department's primary concern was Tiffany's mental health and her ability to maintain emotional stability over a long period of time. Metheny had seen Tiffany be stable in "short spurts," but was concerned that Tiffany would not be able to provide safety on a consistent basis for Audrey. As an example, Metheny recalled a time when Tiffany was creating a relapse prevention plan. Tiffany said that Audrey needed to be able to identify when Tiffany was struggling and when the family support worker redirected Tiffany and indicated that Audrey was too young for that responsibility, Tiffany pushed back and said that Audrey needed to be aware of Tiffany's state. This concerned Metheny as Audrey was only 6 years old at the time and Tiffany did not seem to understand that it was not age or role appropriate to include Audrey into her relapse prevention plan.

Oliverius agreed that there were still active safety threats present in the case after more than 27 months. Tiffany does not have the ability to keep her emotional well-being in check and continues to struggle with her mental health, and that affects Audrey. Issues at the beginning of the case, including Tiffany's delusions and her belief that Audrey needs to monitor Tiffany's mental health cues and be able to calm her, have carried on throughout the case and have caused the Department major concern.

### (b) Evidence as to Clifford

Zeiler testified that genetic testing conducted in April 2021 confirmed that Clifford was Audrey's father and he was subsequently brought into the case.

### (i) Incarceration

Clifford was unable to be present for the entirety of the termination trial, as he was arrested shortly beforehand and incarcerated in Louisiana. Vanessa testified that Clifford was riding a mini bike without a license and later fled the police. Clifford was charged with various traffic violations and flight from a police officer as a result of the incident.

On the second day of trial, Clifford's attorney made an oral motion for transport, noting that Louisiana law enforcement was requiring a court order to make arrangements for Clifford to attend the trial via Zoom videoconference. The motion for transport was granted by the juvenile

court at trial and an order for transport for a Zoom hearing was filed the same day. However, our record reflects that though the transport order was granted, Clifford did not attend any of the termination trial, either in person or virtually.

### (ii) Parenting Time

Goodall supervised virtual visits between Clifford and Audrey. The visits went well and Audrey was always excited and happy to speak with Clifford. Clifford thought of creative ways to engage Audrey on the video calls, such as building a fairy garden and showing it to Audrey, walking her through making a batch of Play-Doh cookies, and taking the video call outside to show Audrey the animals he owned and having her help name them. Goodall observed that it is often challenging for a young child to sit through virtual visits, and that Clifford exhibited excellent parenting skills in captivating Audrey's attention. Metheny testified that Clifford also had two in person visits with Audrey in Nebraska which included trips to the zoo and park.

Metheny described Clifford as "amenable and polite." She agreed that Clifford has met the only goal in his case plan by meaningfully participating in virtual visits. Clifford had also gone above the requirements of the case plan by offering to do virtual bedtime stories through the assistance of Audrey's foster parent. Oliverius described Clifford as the "non-offending parent," and stated that the Department had no concerns regarding safety, mental health, or parental ability with regard to Clifford.

Vanessa testified that Clifford stayed at her home with Audrey during Audrey's extended visits to Louisiana, but he has not lived in Vanessa's home since Audrey was placed there. Vanessa alluded to visits occurring between Clifford and Audrey since Audrey's move, but did not describe them. Vanessa had observed a bond between Clifford and Audrey and that Clifford is "actively trying" to parent Audrey.

### (iii) Housing

Metheny testified that Clifford's ICPC was denied due to the condition of his home, which was damaged in a hurricane 3 years prior. Clifford explained to Metheny that the roof was leaking and that most of the siding on one side of the home was gone. Clifford works as a handyman, but Metheny did not believe that he had the resources to make the necessary repairs to the home. Clifford passed the necessary background checks for the ICPC and Metheny agreed that if housing were not an issue, the ICPC would have been approved. Clifford did assist in the remodeling of Vanessa's home to ready it for Audrey's placement change. It is unclear from the record whether Clifford is presently living in his damaged home or in another location.

### (iv) Domestic Violence

Multiple witnesses testified to concerns regarding domestic abuse between Clifford and Tiffany. Vanessa testified that she witnessed violence on one occasion, but was unable to recall the date. She observed a heated argument between the couple and Clifford putting his hands around Tiffany's throat and strangling her. When Vanessa told Clifford to stop, he let go of Tiffany. The children did not observe the altercation. Vanessa did not call the police on that occasion, but did at another time when the couple was fighting and Tiffany was attempting to run Clifford over with her vehicle. Police came to the scene but no one was arrested.

Tiffany's mother testified that when Tiffany was married to Clifford, she called her mother on several occasions to say that she was being abused by Clifford in front of the children. However, Tiffany did not leave the home because she was concerned about the safety of the children. A friend of Tiffany's testified that she knew Clifford personally and that he was never supportive of the family and "very toxic" for Tiffany and the children. Clifford would make Tiffany "fend for the children by herself."

Ferichs testified that he had never been dispatched to Tiffany's home on an allegation of domestic abuse by Clifford and could not recall Tiffany ever mentioning abuse by Clifford during their many conversations. Tiffany never provided Metheny with any documentation to support her allegations of Clifford's domestic abuse of her or sexual abuse of Audrey.

A Louisiana sheriff case report summary from January 2017 was received into evidence. The report included an interview with Clifford where he states that after an argument with Tiffany, Clifford grabbed Tiffany and attempted to pull her out of the car to prevent her from leaving with their joint vehicle. Clifford was subsequently arrested for domestic abuse battery. The report also includes an interview with Tiffany, 2 weeks after the incident, where she reports that during her altercation with Clifford, he jumped onto the hood of Tiffany's car and caused damage to her windshield. Tiffany requested that Clifford's domestic abuse charges be dropped, but that he be charged with damage to her car. Attached to the report was a complaint waiver, signed by Tiffany, declining to press charges or testify as a witness against Clifford regarding his domestic abuse battery. Tiffany testified that she did not press charges in January 2017 because when Clifford was out of jail, he threatened to kill Tiffany, as he believed that she called the police.

### 3. ORDER

Following the termination trial, the juvenile court entered an order on November 14, 2022, terminating Tiffany's and Clifford's rights to Audrey. The court found that the GAL had met the burden of proving grounds for termination under § 43-292(2), (5), (6), and (7) as to Tiffany, and under § 43-292(2), (6), and (7) as to Clifford. The court further found that it was in the best interests of Audrey to have Tiffany's and Clifford's parental rights terminated.

Tiffany appeals, and Clifford cross-appeals.

### III. ASSIGNMENTS OF ERROR

Tiffany assigns, consolidated and restated, that (1) the State failed to make reasonable accommodations for her under the Americans with Disabilities Act (ADA), and (2) the juvenile court erred in in finding that termination of her parental rights was in Audrey's best interests.

Clifford cross-appealed, assigning, consolidated and restated, that the juvenile court erred in finding that (1) there was clear and convincing evidence that statutory grounds for termination existed, and (2) that termination of his parental rights was in Audrey's best interests.

As a preliminary matter, we note that Clifford failed to comply with the rules regarding cross-appeals. See Neb. Ct. R. App. P. § 2-109(D)(4) (rev. 2022). Clifford properly designated the cover of his brief as a cross-appeal, but he did not set forth his cross-appeal in a separate division of the brief as required by § 2-109(D)(4). However, because Clifford's brief complies with the rules regarding an appellant's brief and does not take issue with any errors asserted by the appellant, in our discretion, we treat Clifford's brief as a brief on cross-appeal. See *In re Interest*

*of Steven S. et al.*, 27 Neb. App. 831, 936 N.W.2d 762 (2019) (citing *In re Interest of Natasha H. & Sierra H.*, 258 Neb. 131, 602 N.W.2d 439 (1999)).

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. When the evidence is in conflict, however, an appellate court may give weight to the fact that the juvenile court observed the witnesses and accepted one version of facts over another. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021).

## V. ANALYSIS

### 1. Failure to Make Reasonable Accommodations

First, we address the only issue argued by Tiffany but not by Clifford. Tiffany assigns that the State failed to make reasonable accommodations for her under the ADA. Tiffany asserts that the failure to allow CPP to restart and conclude was a violation of the ADA. She argues that due to her mental health disability, she could not have had Audrey returned to her care without CPP, and giving her sufficient CPP sessions was a reasonable accommodation that the juvenile court should have allowed.

Testimony at trial demonstrated that no one at the Department was aware of Tiffany's need for specific accommodations that were not being provided to her. While Tiffany had been diagnosed with PSTD and indicated that she was disabled for the purposes of SSDI, Tiffany had not made a specific request for accommodations. Metheny noted it was the Department's protocol to make appropriate accommodations upon request. However, a review of the record reveals that no such request was ever made by Tiffany, by Tiffany's therapist, or by Tiffany's attorney.

It is clear from the record that the Department provided many services for Tiffany over the course of the case and used a trauma-based approach due to Tiffany's background. The Department facilitated CPP in an effort to address Tiffany's difficulties in parenting Audrey, however, Tiffany terminated the service. Despite Tiffany's argument to the contrary, the various service providers attempted throughout the case to redirect Tiffany in an effort to address her emotional issues and suggested ways to improve her parenting skills.

Tiffany did not make a request for reasonable accommodations under the ADA beyond the services being provided to her by the Department. Tiffany voluntarily terminated the CPP service, and due to the unavailability of providers and Audrey's placement change, Tiffany was unable to resume the service despite the Department's efforts. This assignment of error fails.

### 2. Termination of Parental Rights

#### (a) Statutory Grounds for Termination

The juvenile court found that the GAL had presented clear and convincing evidence to satisfy § 42-292(2), (5), (6), and (7) as to Tiffany, and § 42-292(2), (6), and (7) as to Clifford. Tiffany does not challenge the juvenile court's finding that statutory grounds to terminate have been met. Clifford assigns that the juvenile court erred in finding that statutory grounds for termination existed, but argues only that no evidence was presented at trial to show that he is an unfit parent; which we take up under our best interests analysis. In order to be considered by an

appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error. *In re Interest of Hope L. et al.*, 278 Neb. 869, 775 N.W.2d 384 (2009). However, because our review is de novo, we address this requirement for termination of parental rights.

Section 43-292(7) allows for termination when the juvenile has been in an out-of-home placement for 15 or more months of the most recent 22 months. It operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Kenna S.*, 17 Neb. App. 544, 766 N.W.2d 424 (2009). In a case of termination of parental rights based on § 43-292(7), the protection afforded the rights of the parent comes in the best interests step of the analysis. *Id*.

Here, Audrey has been in out-of-home placement for 15 or more months of the most recent 22 months. Audrey was removed from Tiffany's care on May 5, 2020. The GAL filed the motion for termination of parental rights on March 17, 2022, and the termination trial was held in July, August, and September 2022. Audrey remained out of the home since her removal in May 2020. At the start of trial, Audrey had been out of the home for 24 months. Thus, the statutory requirement for termination under § 43-292(7) has been met.

If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019). Because the GAL presented clear and convincing evidence that Audrey had been in an out-of-home placement for 15 or more months of the most recent 22 months, statutory grounds for termination of Tiffany's and Clifford's parental rights exists.

### (b) Best Interests With Respect to Tiffany

Tiffany assigns that the juvenile court erred in finding that it was in Audrey's best interests to terminate her parental rights. In addition to proving a statutory ground, the State must show that termination of parental rights is in the best interests of the children. § 43-292; *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016). Because the parent's right to raise his or her children is constitutionally protected, the court may terminate parental rights only when the State shows that the parent is unfit. *In re Interest of Isabel P. et al., supra*. There is a rebuttable presumption that the best interests of the children are served by having a relationship with their parent. *Id*. This presumption is overcome only when the State has proved that the parent is unfit. *Id*. Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to the child's well-being. *Id*.

The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). While both are separate inquiries, each examines essentially the same underlying facts. *Id*. In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *In re Interest of Becka P. et al., supra*. In cases where termination of parental rights is based on § 43-292(7), appellate courts must be particularly diligent in their de novo review of whether

termination of parental rights is in fact in the child's best interests. *In re Interest of Becka P. et al., supra*.

Tiffany's mental health has been a concern throughout the case. Metheny noted that Tiffany had a pattern of doing well for a few months but then struggling. Despite Tiffany undergoing treatment for substance use and participating in both individual therapy and CPP, Tiffany relapsed on methamphetamine and threatened suicide in December 2021 when she was upset by how the case was progressing. As Tiffany's parenting assessment noted, Tiffany had inappropriate expectations of Audrey, as evidenced by including Audrey in her relapse prevention plan and tasking Audrey with monitoring Tiffany's emotional state. Tiffany also had inappropriate conversations during her parenting time, including sharing that she was worried about Clifford abusing Audrey shortly before their in person visit was set to occur. Tiffany's delusional thinking was a fixture of the case, and we are particularly concerned about reports that Tiffany's delusions may have contributed to her allegations of her children's sexual abuse. Tiffany did meet some of her case plan goals, was well prepared for visits, and was making positive progress in CPP with Hald before Tiffany terminated the service. However, Tiffany failed to sustain this progress for any substantial period of time and it is unlikely that she would be able to provide for Audrey's physical and emotional needs on her own. Lawhon noted in March 2022 that due to the chronic nature of Tiffany's mental health obstacles, she will likely need extended support.

We recognize that Tiffany's mental health diagnoses and challenging childhood have created many barriers to reunification. However, Tiffany has also failed to demonstrate any responsibility or insight throughout the case. At trial, Tiffany continued to deny the circumstances that led to her children's removal, deny that she had tested positive for methamphetamine in December 2021 despite lab testing confirmation, and described her firing Hald as a miscommunication. Tiffany's testimony makes clear that she has taken no accountability for her contribution to Audrey's trauma.

Additionally, Tiffany testified at trial that because of her disability, she needs to have appropriate parenting skills modeled for her. However, a review of the record reveals that Tiffany was unwilling and unable to receive any negative feedback. Tiffany threatened and disparaged the Department, family support workers, and visitation workers. She was argumentative and defensive during family team meetings, at times leaving the meetings abruptly. When family support workers attempted to redirect Tiffany when she was making inappropriate or delusional comments during parenting time, she became so emotional that her young children would provide her with comfort and the visit would have to be ended early. When Hald questioned Tiffany as to why she had not progressed to unsupervised visits, she terminated both CPP and Hald's individual therapy sessions with Audrey. Tiffany has made threats of violence and retribution to those who work on her case, as well as to Vanessa, Audrey's grandmother and new placement. Tiffany's hostile attitude has not only impacted those who provide services on her case, but also Audrey's access to those services. Because of Tiffany's actions, Audrey was denied continued CPP sessions and the full length of parenting time visits.

Trial testimony evidenced the love Tiffany has for Audrey. However, the Nebraska Supreme Court has held that having a bond with a child does not make the parent a fit person to provide parental care for the child. See *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). Rather, the evidence adduced at the termination trial demonstrates that Tiffany is unable

to sufficiently manage her mental health to provide Audrey with the level of parental care she requires.

Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Zanaya W. et al.*, 291 Neb. 20, 863 N.W.2d 803 (2015). Based on the evidence presented, there has been minimal change in Tiffany's behavior over the course of the case, and based on Tiffany's mental health struggles and general lack of insight, she is unlikely to change in the future.

Tiffany next argues that that a guardianship, rather than a termination of her parental rights, was in Audrey's best interests, as Tiffany had made progress on her case plan and she and Audrey are closely bonded. We acknowledge that a guardianship in some instances might be a reasonable alternative to termination of parental rights. But there is no burden on the State to prove that termination is the only alternative available. *In re Interest of Q.R. and D.R.*, 231 Neb. 791, 438 N.W.2d 146 (1989). Also, the Nebraska Supreme Court has noted that a guardianship does not achieve the degree of permanency equivalent to parenthood or adoption. See *In re Interest of Antonio S. & Priscilla S.*, 270 Neb. 792, 708 N.W.2d 614 (2005). A guardianship under the Nebraska Juvenile Code is subject to the continuing jurisdiction of the juvenile court, which retains the power to terminate the guardianship. *Id*. See, also, *In re Interest of Amber G. et al.*, 250 Neb. 973, 554 N.W.2d 142 (1996), *disapproved on other grounds, In re Interest of Lilly S. & Vincent S.*, 298 Neb. 306, 903 N.W.2d 651 (2017) (when guardianship is established, parent retains right to petition court for restoration of custody and full parental rights). Testimony at trial also indicated that the Department was concerned that a guardianship would allow Tiffany to harass Vanessa. Based on our de novo review, and considering Audrey's young age, we conclude that a guardianship would not provide the permanency needed for Audrey, as it would leave open Tiffany's right to petition the court for restoration of custody. Accordingly, a guardianship was not in Audrey's best interests.

Further, Nebraska courts have recognized that children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Octavio B. et al.*, 290 Neb. 589, 861 N.W.2d 415 (2015). Audrey has been in foster care since May 2020. Hald testified that Audrey's lack of permanency was preventing her from making therapeutic disclosures, expressing her tastes and preferences, and learning to regulate her emotions. Despite working with Audrey from July 2021 to May 2022, Hald stated that Audrey's therapeutic progress was static due to her lack of permanency. Audrey deserves stability in her life and should not be suspended in foster care when Tiffany is unable to rehabilitate herself. Accordingly, we find there was clear and convincing evidence to show that Tiffany was unfit and that terminating her parental rights was in Audrey's best interests.

(c) Best Interests With Respect to Clifford

Clifford raises two assignments of error on appeal. First, he assigns that the juvenile court erred in finding that termination of his parental rights was in the best interests of Audrey. Second, Clifford assigns that no evidence offered at trial supported a finding that he was unfit to parent Audrey. We note at the outset that parental unfitness is not an explicit element of an action to terminate parental rights under § 43-292. Rather, "some showing of unfitness" has been found by both the Nebraska Supreme Court and the U.S. Supreme Court to be a necessary component of

termination proceedings under the Due Process Clause of the U.S. Constitution. *In re Interest Mateo L. et al.*, 309 Neb. 565, 582, 961 N.W.2d 516, 529 (2021) (citing *In re Interest of Xavier H.*, 274 Neb. 331, 740 N.W.2d 13 (2007), quoting *Quilloin v. Walcott*, 434 U.S. 246, 98 S. Ct. 549, 54 L. Ed. 2d 511 (1978)). As such, our review of best interests necessarily entails an inquiry into whether there was an adequate showing of parental unfitness to satisfy the requirements of due process. Thus, we consolidate Clifford's two assignments of error into a single assignment that the juvenile court erred in finding that termination was in Audrey's best interests.

Much of the GAL's evidence related to best interests and unfitness focused on Clifford's incarceration and housing. We take up each in turn. Although incarceration alone cannot be the sole basis for terminating parental rights, it is a factor to be considered. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). And we have noted that although incarceration itself may be involuntary as far as a parent is concerned, the criminal conduct causing the incarceration is voluntary. *Id*. Thus, in a case involving termination of parental rights, it is proper to consider a parent's inability to perform his or her parental obligations because of incarceration. *Id*. We recognize and consider that it was Clifford's own actions that caused him to be incarcerated and miss the termination trial. We also consider the fact that at trial, only Vanessa testified to Clifford's charges and incarceration and no documentary evidence was offered. It is unclear from the record whether Clifford had been convicted of his traffic-related charges and if so, the length of any sentence imposed.

Regarding Clifford's lack of appropriate housing, Metheny testified that Clifford's ICPC was denied only because his home had been damaged in a natural disaster 3 years ago. However, no other evidence regarding the state of Clifford's housing was offered; there was no testimony from the Louisiana social services worker who conducted Clifford's ICPC, no photographs of his home, and the ICPC itself was not offered in evidence. The extent of the home's damage, the current condition of the home, and the status of ongoing repair efforts is unclear from our record, and under the circumstances, we do not consider Clifford's lack of suitable housing to be evidence of his parental unfitness.

Further, Audrey was placed in Louisiana with Vanessa shortly before the termination trial. Vanessa testified that Clifford stayed in her home during Audrey's extended visits to Louisiana, and assisted Vanessa in preparing the home for Audrey, but that Clifford was not living with her after Audrey's placement change. It is unclear where Clifford was residing (prior to his arrest) at the time of trial, and whether the Department had discussed the possibility of Clifford moving into Vanessa's home long-term to care for Audrey.

We are concerned by reports of domestic violence between Tiffany and Clifford. However, we note that Tiffany and Clifford separated prior to the start of this juvenile case and there is no evidence in our record to indicate that Clifford has since engaged in domestic violence. Although Clifford was arrested for domestic abuse battery in 2017, no charges were filed. Oliverius testified that the Department had no concerns regarding safety, mental health, or parental ability with regard to Clifford. By all accounts Clifford's parenting time with Audrey was safe and appropriate.

The GAL argues that Clifford's actions in facilitating placement of Audrey with his mother, and his support of a guardianship with her, are indicative of his forfeiture of his parental rights. Generally, parental rights may be forfeited by a substantial, continuous, and repeated neglect of a child and a failure to discharge the duties of parental care and protection. *In re*

*Guardianship of Robert D.*, 269 Neb. 820, 696 N.W.2d 461 (2005). Substantial, continuous, and repeated neglect of a child may be established by the complete indifference of a parent for a child's welfare over a long period of time. See *id*. The initial burden of proving parental unfitness or forfeiture of a parent's right to custody is on the State. See *In re Interest of Lilly S. & Vincent S.*, 298 Neb. 306, 903 N.W.2d 651 (2017). Clifford indicated his support of Audrey being placed into a guardianship with Vanessa as a reasonable alternative to the termination of his parental rights. The GAL argues that Clifford's acquiescence to the possibility of a guardianship is evidence that Clifford "was very comfortable with his mom parenting his child and if you are going to give up that easily, that means you are forfeiting your right to parent." Brief for appellee at 16. We disagree.

While Clifford did travel to Nebraska with Vanessa for his in person visits with Audrey and assisted in readying Vanessa's home for Audrey after his own ICPC was denied, we do not find that such actions demonstrated an intent to forfeit his parental rights. Rather, such actions facilitated Audrey's move to Louisiana where Clifford resides. Clifford's support of Audrey's placement with Vanessa has allowed Clifford to more easily have in person parenting time as he works towards reunification with Audrey. Further, arguing in favor of a guardianship as an alternative to the termination of parental rights does not indicate a forfeiture of Clifford's parental rights. A review of our record does not reflect that Clifford ever intended a desire to be free from his parental obligations or forfeit his relationship with Audrey. In addition to ensuring Audrey's placement with his mother, Clifford engaged in all of the services provided to him by the Department designed to reunify him with Audrey.

Although a statutory ground did exist to terminate Clifford's parental rights in this case, we find that the GAL has not met its burden to prove by clear and convincing evidence that Clifford is unfit, has forfeited his parental rights, or that it is in Audrey's best interests for Clifford's parental rights to be terminated at this time. Clifford's only case plan goal was to meet Audrey's needs and demonstrate appropriate parenting skills by participating in visitation. Goodall testified that Clifford's virtual visits with Audrey went well and that he thought of creative ways to keep Audrey engaged, such as by building a fairy garden and showing it to Audrey, prompting her play, and taking the video call outside to show Audrey the animals he owned and having her help name them. Clifford also traveled to Nebraska to have two in person visits with Audrey. Metheny testified that Clifford had gone above the requirements of the case plan by offering to do virtual bedtime stories for Audrey. Metheny agreed that Clifford had met his case plan goal. Clifford has been described as the "non-offending parent" throughout the case and has satisfied his court ordered requirement. Moreover, given that Audrey was placed in Vanessa's care in Louisiana shortly before the termination trial, Clifford now has the opportunity to further demonstrate his parental fitness by having consistent in person visits with Audrey. Vanessa testified that such in person visits were already occurring at the time of the termination trial.

Given the circumstances of this case, we believe that Clifford should be given such an opportunity, and we therefore reverse the order of the juvenile court terminating his parental rights to Audrey. See *In re Interest of Giavonna G.*, 23 Neb. App. 853, 876 N.W.2d 422 (2016) (termination of parental rights is final and complete severance of child from parent and removes entire bundle of parental rights; therefore, with such severe and final consequences, parental rights should be terminated only in absence of reasonable alternative and as last resort).

## VI. CONCLUSION

Upon our de novo review of the record, we affirm the order of the juvenile court terminating Tiffany's parental rights, and we reverse the order of the juvenile court terminating Clifford's parental rights and remand the cause for further proceedings.

AFFIRMED IN PART, AND IN PART REVERSED AND
REMANDED FOR FURTHER PROCEEDINGS.